JS 44 (Rev. 12/12)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**14  4424**

## I. (a) PLAINTIFFS
RICHARD FIELDS

**DEFENDANTS**
CITY OF PHILADELPHIA; POLICE OFFICER SISCA, Badge No. 9547; JOHN DOE, an unknown Philadelphia Police Officer

**(b)** County of Residence of First Listed Plaintiff    PHILADELPHIA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
(SEE ATTACHED)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983
Brief description of cause:
First Amendment suit arising out of arrest for recording the police

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*
JUDGE YOHN

DOCKET NUMBER 13-cv-256 ; 13cv 3081, 3082

13-cv-

DATE  7/24/14

SIGNATURE OF ATTORNEY OF RECORD

JUL 24 2014

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

ADDENDUM TO CIVIL COVER SHEET

I(c) Plaintiff's Attorneys

MOLLY TACK-HOOPER
PA ID No. 307828
ACLU of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
Tel: (215) 592-1513 ext. 113
Fax: (215) 592-1343
mtack-hooper@aclupa.org

MARY CATHERINE ROPER
PA ID No. 71107
ACLU of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
Tel: (215) 592-1513 ext. 116
Fax: (215) 592-1343
mroper@aclupa.org

JONATHAN H. FEINBERG
PA ID No. 88227
Kairys, Rudovsky, Messing, & Feinberg
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Tel: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com

JOHN J. GROGAN
PA ID No. 72443
Langer & Grogan, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320.5662 Tel.
215.320.5703 Fax.
jgrogan@langergrogan.com

PETER LECKMAN
PA ID No. 312076
Langer & Grogan, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320.5662 Tel.
215.320.5703 Fax.
pleckman@langergrogan.com

SETH F. KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

I(d) Defendants' Attorneys

JOHN J. COYLE
Assistant City Solicitor
City of Philadelphia Law Dept.
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
john.coyle@phila.gov
P: 215-683-5447
F: 215-683-5397

**WY**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  1850 N. 18th Street, Philadelphia PA  19121

Address of Defendant: Philadelphia Police Department, 750 Race St., Philadelphia, PA 19106

Place of Accident, Incident or Transaction:  1900 block of North 18th Street, Philadelphia, PA 19121
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐   No☒

Does this case involve multidistrict litigation possibilities?     Yes☐   No☒
*RELATED CASE, IF ANY:*
Case Number: 13cv256; 13cv3081; 13cv3082  Judge  YOHN     Date Terminated:  n/a

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
     Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
     Yes☒   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
     Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
     Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Molly Tack-Hooper , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: 07/24/2014 _____     PA ID No. 307828
                  Attorney-at-Law                Attorney I.D.#  JUL 24 2014

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 07/24/2014 _____     PA ID No. 307828
                  Attorney-at-Law                Attorney I.D.#

CIV. 609 (5/2012)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

RICHARD FIELDS,
         *Plaintiff,*          :        CIVIL ACTION
               :
          v.          :    **14    4424**
CITY OF PHILADELPHIA, et al.,  :
         *Defendants.*    :        NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)      ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.  (X)

| 7/24/2014 | Molly Tack-Hooper | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 592-1513 x 113 | (215) 592-1343 | mtack-hooper@aclupa.org |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JUL 24 2014

 

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| RICHARD FIELDS,<br><br>  *Plaintiff,*<br><br>v.<br><br>CITY OF PHILADELPHIA,<br>POLICE OFFICER SISCA, Badge No. 9547,<br>and JOHN DOE, an unknown Philadelphia<br>Police Officer,<br><br>  *Defendants.* | **1 4 4 4 2 4**<br><br>Civil Action No._____ |

### COMPLAINT

### INTRODUCTION

Observing police officers' behavior in public is activity protected by the First Amendment to the U.S. Constitution. It is not a crime. Nevertheless, notwithstanding a widely publicized Department policy endorsing these principles, Philadelphia police officers, due to serious deficits in training, supervision, and discipline, have routinely punished civilians who observe or record police activity by filing false criminal charges against them. This case is brought by a man who, due to the deliberate indifference of the City of Philadelphia and the unlawful actions of two individual police officers, was arrested, handcuffed, and prosecuted simply for observing and photographing a police officer at work. This civil rights action seeks declaratory relief and damages.

## JURISDICTION AND VENUE

1.  This action to vindicate Plaintiff's rights protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution is brought under 42 U.S.C. § 1983.  This Court has jurisdiction over this civil rights action under 28 U.S.C. §§ 1331 and 1343.  This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

2.  Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) in that the defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that give rise to this action occurred within the Eastern District of Pennsylvania.

## PARTIES

3.  Plaintiff Richard Fields is a resident of the City of Philadelphia in the Commonwealth of Pennsylvania.

4.  Defendant City of Philadelphia is a political subdivision of the Commonwealth of Pennsylvania and manages, directs, and controls the Philadelphia Police Department ("PPD"), which employs Defendant Sisca and Doe.

5.  Defendant Sisca, Badge No. 9547, was, at all times here mentioned, an officer with the PPD and was acting under color of state law.  Defendant Sisca is sued in his individual capacity.

6.  Defendant John Doe was, at all times here mentioned, an officer with the PPD and was acting under color of state law.  Defendant Doe is sued in his individual capacity.  Plaintiff does not presently know Defendant Doe's true identity but will seek leave to amend the Complaint to properly name this Defendant after conducting discovery.

2

## FACTUAL ALLEGATIONS

### Mr. Fields' Unlawful Arrest

7. Plaintiff, Mr. Fields, is an undergraduate student at Temple University.

8. On the night of September 13, 2013, around 11pm, Mr. Fields left his house on North 18th Street to walk to another friend's house down the street.

9. As Mr. Fields walked down the sidewalk on the east side of the 1900 block of North 18th Street, Mr. Fields observed approximately 20 police officers across the street outside of a house on the west side of the block where there appeared to have been a party. Some of the officers were leading people out of the house, and other officers were standing in the street.

10. Mr. Fields stopped walking to photograph the scene outside of the house across the street with his iPhone. The nearest police officer was standing approximately 15 feet away from Mr. Fields, in the middle of the street.

11. Defendant Sisca observed Mr. Fields taking a photo with his iPhone and walked toward Mr. Fields, who remained still.

12. As Defendant Sisca approached Mr. Fields, Defendant Sisca asked, "Do you like taking pictures of grown men?" He then ordered Mr. Fields to leave.

13. Mr. Fields responded that he was on public property and not interfering with any police investigation.

14. Defendant Sisca came within one foot of Mr. Fields, and ordered him to leave again, and bumped Mr. Fields with his chest. Mr. Fields still refused to leave.

15. Defendant Sisca then grabbed Mr. Fields' arm, placed Mr. Fields in handcuffs, and searched Mr. Fields' pockets, confiscating all of Mr. Fields' property, including his iPhone.

3

16. Defendant Sisca threw the iPhone onto a concrete stoop about four feet away, cracking the screen.

17. Mr. Fields asked several times why he was being arrested, and Defendant Sisca did not respond.

18. Defendant Sisca placed Mr. Fields in the back of a police van and detained Mr. Fields in the van for approximately 20 to 30 minutes.

19. When Defendant Sisca removed Mr. Fields from the van, he handed Mr. Fields a citation for the summary offense of Obstructing Highway and Other Public Passages under 18 Pa. C.S. § 5507.

20. The citation issued to Mr. Fields states that he was observed "standing in the area of a police invest[igation] videotapping [sic] w phone," and that Mr. Fields was arrested when he refused to leave the area.

21. Defendant Sisca also returned Mr. Fields' belongings, including his now-cracked iPhone, which had several photography and recording "apps" open that were not open before police confiscated the phone. Upon information and belief, Defendants Sisca and John Doe searched the phone while it was out of Mr. Fields' possession to try to locate photos or recordings of the police that they believed Mr. Fields had taken.

22. At no time did Mr. Fields act in a fashion that provided probable cause to arrest him for obstructing a highway under 18 Pa. C.S. § 5507 or for any other offense.

23. Defendant Sisca arrested Mr. Fields and initiated criminal charges against Mr. Fields without probable cause and in retaliation for photographing Defendant Sisca and other police officers.

4

24. At no time did Defendants Sisca and John Doe have probable cause or any other justification for searching the contents of Mr. Fields' phone.

25. On October 31, 2013, Mr. Fields appeared for trial in the Philadelphia Municipal Court, and all charges were withdrawn on the prosecution's motion.

### The City's Policy, Practice, and Custom

26. Mr. Fields' retaliatory arrest for photographing the police is a direct result of the policies, practices, and customs of Defendant City of Philadelphia ("City"), whereby Philadelphia police officers routinely arrest and/or institute criminal proceedings against civilians who observe or record police activities.

27. Officers institute these proceedings in order to intimidate civilians so that they will not continue to monitor and record police behavior and in retaliation against civilians' constitutionally protected activity.

28. Supervisory police officials, up to and including Police Commissioner Charles H. Ramsey, are aware of, and have been deliberately indifferent to, the practice of Philadelphia police officers to routinely retaliate against civilians for observing and/or recording them.

29. Prior to Mr. Fields' arrest in September 2013, Defendant City of Philadelphia, through its policymakers, knew or had reason to know of these practices due to multiple incidents reported to local media and Philadelphia civil rights groups involving police conduct similar to that of the Defendant officers in this case.

### Early Cases: 2010–2011

30. The incidents that placed the City on notice as to the practice of PPD officers to retaliate against citizens for observing and/or recording police date back more than three years prior to Mr. Fields' arrest.

5

31. For instance, on July 23, 2010, Melissa Hurling and Shakir Riley were assaulted by PPD officers when they attempted to use their cellphones to record what they considered to be a violent arrest. When police saw Riley filming them, they chased him and then slammed him to the ground, kicking and punching him. When Hurling pulled out her phone to record the police assaulting Riley, she was pushed against a jeep and punched by an officer, and then grabbed by her hair and slammed against the ground. Hurling's mother then found her cellphone at the scene of the incident broken in half as if it had been intentionally destroyed. Riley and Hurling were charged with disorderly conduct, but the charges were dismissed at a summary trial in March 2011.

32. On January 23, 2011, Christopher Montgomery, a journalism student at Temple University, was arrested for using his cellphone to record PPD officers making arrests on the corner of 15th and Chestnut Streets. Mr. Montgomery complied with the police officers' requests to step back. Mr. Montgomery remained a safe distance away from the arresting officers and did not attempt to interfere with the investigation in any way. Nevertheless, police confiscated his cellphone and charged him with disorderly conduct; he was later found not guilty of those charges.

33. In March 2011, PPD policymakers, including, upon information and belief, Commissioner Ramsey, directed a detective to "re-investigate" a February 13, 2011 incident involving Mark Fiorino, who was stopped and threatened—*but not charged*—by a Philadelphia police officer for openly carrying his licensed firearm. According to a PPD spokesperson, the Commissioner gave this order after learning that Mr. Fiorino had posted an audio recording of the February 13 incident on YouTube. The detective assigned to investigate criminal charges against Mr. Fiorino believed he was being directed to investigate the potential for charges against

6

Mr. Fiorino because of the audio recording. As a result of this "re-investigation," on April 15, 2011—two months after the incident—a PPD detective initiated charges of disorderly conduct and recklessly endangering another person against Mr. Fiorino, alleging that his simultaneous possession of a licensed firearm *and an audio recorder* meant that Mr. Fiorino was trying to spark a violent police reaction. Mr. Fiorino was ultimately found not guilty of all charges.

34. On June 15, 2011, Alexine Fleck was arrested near her home for observing a police officer in his interactions with an apparently intoxicated man sitting on a stoop. Although she stepped back when the officer instructed her to do so, she would not leave. The officer took her into custody and charged her with "failure to disperse." Those charges were later dismissed.

35. On July 2, 2011, according to media reports, a woman named Zanberle Sheppard was told by neighbors that PPD officers were beating her handcuffed boyfriend in an alley outside their home. Using her cellphone, she recorded the arrest. Sheppard then ran into the alley where, following an altercation, the officers seized her phone. When Sheppard later received her phone back from the PPD, the battery was missing and the video was gone. Sheppard was charged with disorderly conduct. She was found guilty on August 22, 2011 following a summary trial and was fined.

36. On July 14, 2011, Coulter Loeb was observing and photographing police in Rittenhouse Square as they evicted an apparently homeless man and woman from the park. As the police walked the woman along the sidewalk leading to the street, Mr. Loeb followed at a distance. One of the officers directed Mr. Loeb to walk in the other direction. When Mr. Loeb refused, the officer accused Mr. Loeb of interfering with police business, then arrested him and charged him with disorderly conduct. The charges were later dismissed.

7

## Commissioner Ramsey's September 2011 Memorandum

37. In September 2011, Commissioner Ramsey, having attended a conference with police executives from several other large cities and having discussed the importance of establishing clear policies regarding police response to the use of cell phones to record officers in the performance of their duties, instructed his staff to prepare written guidance for PPD officers.

38. In the course of preparing that guidance, the Commissioner's legal advisor spoke to multiple Philadelphia police officers and learned that many officers believed it was unlawful for civilians to record police activities and that, accordingly, police could make arrests in such circumstances.

39. On September 23, 2011, Commissioner Ramsey issued a memorandum to "remove any confusion as to duties and responsibilities of sworn personnel when being photographed, videotaped, or audibly recorded while conducting official business or while acting in an official capacity in any public place" and instructed PPD officers to allow themselves to be recorded.

40. The memorandum was distributed and read to patrol officers at roll call. There was no additional training on the information contained in the memorandum.

## Continued Improper and Retaliatory Arrests

41. After Commissioner Ramsey's September 2011 Memorandum, PPD officers continued to arrest citizens for observing or recording the police. Several of these incidents were reported in the press or became the subject of complaints submitted to the PPD.

42. For example, according to press reports, on March 14, 2012, a photojournalism student at Temple University, Ian Van Kuyk, was photographing a traffic stop as part of a course assignment for night photography. When Mr. Van Kuyk refused to stop photographing, PPD officers arrested him and his girlfriend, who attempted to rescue Mr. Van Kuyk's camera. Mr.

8

Van Kuyk was charged with disorderly conduct, obstruction of justice, resisting arrest and hindering apprehension; his girlfriend was charged with obstruction and disorderly conduct. On November 27, 2012, Mr. Van Kuyk was found not guilty on all charges following a trial.

### Directive 145

43. Shortly after Mr. Van Kuyk's arrest, in or around May 2012, PPD policymakers, including Commissioner Ramsey, learned that the U.S. Department of Justice had filed briefing in a civil rights case brought in Baltimore, Maryland asserting the position of the federal government that the right of citizens to record police in the performance of their duties is protected by the First Amendment.

44. In November 2012, having learned of the position asserted by the Justice Department, Commissioner Ramsey issued Directive 145, which supplemented the September 2011 Memorandum with a more detailed description of PPD officers' responsibilities regarding civilians who observe and record police in the performance of their duties.

45. The Directive specified that PPD officers should expect to be photographed, videotaped, or recorded while performing their official duties in public and instructed that PPD officers should not interfere with such recording.

46. The Directive provided, further, that before taking any action against a person who is recording, police should consult with a supervisor.

47. When Directive 145 was issued, PPD commanding officers were instructed to distribute the new policy to all personnel. Aside from making the Directive available to officers and reading pertinent parts of the Directive at roll call, PPD provided no additional training to officers concerning their responsibilities as outlined in the Directive.

9

2013: Notice of Continued Unlawful Police Actions to Engage in Retaliatory Arrests

48. In January 2013, the undersigned counsel filed the first of three separate lawsuits alleging that PPD officers had violated the First and Fourth Amendments by arresting a civilian for recording police officers in the performance of their duties. The complaint, filed on behalf of Christopher Montgomery, whose arrest is described above, alleged that he was arrested despite having committed no crime, that his arrest was in retaliation for the exercise of First Amendment rights and that his arrest was the result of a PPD policy, practice or custom.

49. As a result of the filing of this lawsuit, PPD policymakers were aware of allegations that PPD officers had, pursuant to a City policy, practice, or custom, routinely and unlawfully arrested citizens in retaliation for the recording of police in the performance of their duties despite the fact that no crime had been committed.

50. Just two months after the filing of the Montgomery lawsuit, on March 15, 2013, the Commissioner and his high ranking advisors received a Recommendation Memorandum from the Police Advisory Commission ("PAC"), an appointed board of civilians tasked with monitoring police practices, stating that Philadelphia police had continued to retaliate against people for videotaping police notwithstanding the Commissioner's September 2011 memorandum prohibiting such conduct.

51. The Memorandum specifically advised PPD policymakers of the PAC's concern as to the number of reported incidents:

> Recent news accounts indicate that Philadelphia police officers are
> not adhering to Philadelphia Police Department Memorandum 11-
> 01, the directive related to the confiscation of recording devices.
> Additionally, the Internal Affairs database shows at least eight
> citizen complaints since 2011 where people were allegedly
> retaliated against for videotaping police. Six of those incidents
> occurred AFTER the directive was issued in September 2011. One

10

> of the more serious cases involving the videotaping of police from
> 2012 resulted in partially sustained charges against two officers.
>
> ...
>
> The Police Advisory Commission recommends that all police
> personnel be reminded, in writing, of the existing recommendation
> and that departmental action be instituted against any member of
> the PPD not adhering to the recommendation.

52. Each of the incidents referred to by the PAC had been previously reported to the

Philadelphia Police Department's Internal Affairs Division and were thus known to PPD and its

policymakers, and, accordingly, the PAC Memorandum served the purpose of highlighting those

incidents and reinforcing the need for intervention by PPD policymakers.

53. Two incidents referenced in the PAC Memorandum, which preceded the issuance of the

Commissioner's September 2011 memorandum, included the following:

   a. A March 1, 2011 incident where J.C. alleged that he and two other males were

   physically abused by police and that back-up officers who arrived at the scene

   confiscated the cellphones of bystanders who had videoed the incident.

   b. A July 29, 2011, incident where B.K-C. alleged that he videotaped police who

   were striking a male with batons and, after the police realized that he was

   recording the officers, police attacked him, knocked his cell phone out of his

   hands, and caused him injury.

54. The PAC Memorandum also referred to seven incidents that post-dated the issuance of

the Commissioner's September 2011 memorandum, including the following:

   a. An October 2, 2011 incident where T.G. alleged that he was subjected to an

   unlawful car stop and that, once officers noticed that he was recording the

   incident, the officers grabbed T.G.'s cellphone, deleted the recording, and

   damaged the cellphone.

11

b. A November 15, 2011 incident where A.R. alleged that officers pulled him out of his vehicle and slammed him to the ground and that one of the involved officers pointed a gun at a bystander, who was videotaping the incident, while ordering the bystander to put away his cellphone.

c. A February 21, 2012 incident where R.F. alleged that officers who learned that he had previously videoed them physically abusing civilians threatened to kill him if he ever recorded them again and then physically assaulted him.

d. An April 4, 2012 incident where M.H. and D.C. alleged that M.H. recorded officers assaulting D.C. and that the officers, upon realizing that she had made a recording, threatened M.H. and demanded that she provide the password to her cellphone; once M.H. gave the officers her password, she alleged, the officers deleted all recordings of the assault incident.

e. A July 16, 2012 incident where R.H alleged that he was subjected to an unlawful car stop after which officers yelled profanities at him and that once the officers apparently realized that R.H. had videotaped the incident, they attempted to confiscate his cellphone.

f. A September 21, 2012 incident where A.G. alleged that, while serving as a legal observer at a political demonstration and while photographing the arrest of a demonstrator, a member of the PPD Civil Affairs Unit threw her arm into A.G's neck and pinned her against a wall thereby preventing her from recording the demonstrator's arrest.

g. An October 30, 2012 incident where T.H. alleged that he was subjected to an unlawful car stop after which he was removed from his car and that when T.H.

informed officers that the incident was being recorded, an officer who had drawn

his firearm and approached T.H. in an aggressive manner stated in a threatening

way that T.H. would not be recording if "bullets…fly."

55. One incident, which post-dated the Commissioner's issuance of Directive 145, included

the following: A December 16, 2012 incident where A.S. alleged that he informed a police

officer that he had recorded the officer's actions in violently arresting A.S. and that when A.S.

was detained following the arrest and his cellphone was returned to him, the cellphone was

damaged and the memory card was missing.

56. Less than two months after the PAC Memorandum was provided to PPD policymakers,

on June 5, 2014, the undersigned counsel filed two additional lawsuits alleging that PPD officers

had violated the First and Fourth Amendments by arresting a civilian for recording police

officers in the performance of their duties. The complaints, filed on behalf of Coulter Loeb and

Alexine Fleck, whose arrests are described above, alleged, as in the complaint filed on behalf of

Christopher Montgomery, that each plaintiff was arrested despite having committed no crime,

that the plaintiffs' arrests were in retaliation for the exercise of First Amendment rights, and that

the arrests were the result of a PPD policy, practice, or custom.

57. In the course of litigation involving the claims of Christopher Montgomery, Coulter

Loeb, and Alexine Fleck, Defendant City of Philadelphia has produced in discovery information

concerning at least three other incidents of improper police conduct in retaliation for citizens

recording police in the performance of their duties, which incidents were neither reported in the

media nor known to the Police Advisory Commission and dated as far back as 2010. The

incidents include:

13

a.  An October 18, 2010 incident where J.Y.H. alleged that she observed police harassing a handcuffed man and that once the involved officers noticed that she was videotaping the incident, the officers arrested her, confiscated her cellphone, and deleted the video recorded on the cellphone.

b.  A July 21, 2011 incident where J.W. alleged that he was unlawfully arrested for videotaping friends who were standing on a church roof and that, after his arrest, when his cellphone was returned to him, the screen on his cellphone was damaged and the memory card was missing.

c.  An August 11, 2011 incident where M.A. alleged that she videotaped officers who were physically assaulting a man and that officers then confiscated her cell phone, arrested her, and charged her with disorderly conduct.

Notice to the City at the Time of Plaintiff Richard Fields' Arrest

58. As of June 2013, three months before Mr. Fields was arrested as outlined in this Complaint, Defendant City of Philadelphia and its policymakers had ample notice that PPD officers were, despite published policies to the contrary, arresting citizens in retaliation for citizens recording police in the performance of their duties. That notice included, in summary:

a.  At least twenty incidents, each of which is outlined above, and each of which was made known to the PPD through media reports, complaints to the Internal Affairs Division or Police Advisory Commission, and lawsuits brought against the City of Philadelphia.

b.  Three lawsuits specifically alleging that the City, through its policymakers, had, among other things, acted with deliberate indifference to the policy, practice, and

14

        custom of PPD officers to arrest citizens in retaliation for recording police in the

        performance of their duties.

    c.  A specific recommendation from the Police Advisory Commission that, due to

        officers' apparent failure to adhere to PPD directives, PPD take action to remind

        officers of their responsibilities in dealing with citizens recording police activities

        and, likewise, institute disciplinary action against PPD officers failing to comply

        with directives in this context.

59. Notwithstanding this notice, PPD policymakers took no action to remedy the continued

failures of police officers to comply with directives providing that citizens have a

constitutionally protected right to record officers in the performance of their duties other than

providing copies of Directive 145 to be read to officers at roll calls.

60. PPD policymakers, including Commissioner Ramsey, are well aware that long directives

and other policies are often not read in their entirety at roll call, and are often not read as many

times as they are ordered to be read.

61. Further, PPD policymakers were aware that merely reading some or all of the Directive at

roll call was inadequate to change the officers' view that they could arrest citizens who record

police—a view that was reported to the Commissioner's legal adviser in 2011. Incidents of the

type outlined above continued even after PPD supervisors read Directive 145 to officers.

62. PPD policymakers, including Commissioner Ramsey, understand that the mere reading of

a new policy will not change ingrained behavior of PPD officers. When the PPD wants to

change a settled practice or a "culture" among officers, it knows that it must do more than

announce a new policy and read it at roll call. Despite this, PPD policymakers have made no

effort, other than directing the reading of portions of relevant directives to address PPD officers' non-compliance with their responsibilities in this area.

63. Further, despite its knowledge of continued failures by PPD officers to comply with their responsibilities, PPD policymakers have never directed any monitoring of officers' conduct with respect to citizens recording officers in the performance of their duties.

64. Nor have PPD policymakers monitored the conduct of supervisors who, under Directive 145, have a responsibility to approve any arrest or citation of a person recording police.

65. The PPD and its policymakers thus knew that its failure to conduct additional training or supervision or institute any discipline to halt the practice of PPD officers retaliating against people who photograph or record them was likely to lead to additional unconstitutional actions by PPD officers.

66. Accordingly, at the time of Mr. Fields' arrest, PPD policymakers acted with deliberate indifference to the constitutional rights of the persons who watch or record police behavior in the City of Philadelphia by: (a) failing to properly train, supervise, and discipline PPD officers who retaliate against people who observe or record them; (b) inadequately monitoring PPD officers and their practices related to people who watch or record their activities; (c) failing to properly discipline PPD officers who initiate criminal proceedings against people who watch or record their activities or who tamper with the phones of such persons; and (d) failing to rectify the PPD's unconstitutional custom of instituting criminal proceedings against people who watch or record the actions of PPD officers.

67. As a direct and proximate result of the City's policies, practices, and/or customs, Mr. Fields suffered the following injuries and damages:

16

a. Violation of his rights under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, to be free from criminal prosecution or retaliation for engaging in constitutionally protected expressive activity;

b. Violation of his rights under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, to be free from malicious prosecution and illegal search and seizure;

c. Loss of his physical liberty;

d. Monetary losses;

e. Emotional trauma, humiliation, and distress.

## CAUSES OF ACTION

### Count I – First Amendment Retaliation
### (Against Defendant Sisca and the City of Philadelphia)

68. Observing public police activities, without interfering with those duties, is a legitimate means of gathering information for public dissemination and is expressive conduct protected by the First Amendment to the United States Constitution.

69. Defendant Sisca's arrest and prosecution of Plaintiff in the absence of probable cause that Plaintiff had committed a crime constituted unlawful retaliation against Plaintiff by public officials for engaging in activity protected by the First Amendment to the U.S. Constitution.

70. Defendant City of Philadelphia is responsible for the violations of Plaintiff's constitutional rights because Defendant Sisca's actions resulted from the City's deliberate indifference to a custom, pattern, practice, or policy of allowing officers to arrest individuals for their expressive conduct in videotaping police undertaking their official duties and/or a

17

deliberately indifferent failure to train, supervise, and discipline officers who engage in such conduct.

## Count II – Unreasonable Search in Violation of the Fourth Amendment
### (Against All Defendants)

71. The search of Mr. Fields' phone was not and could not have been made for the purpose of investigating the purported crime of "obstruction of highways." Instead, upon information and belief, the sole purpose of that search was to find and destroy any recording made by Mr. Fields with his phone, because Defendant Sisca believed that Mr. Fields had been making a video of an unlawful arrest in progress.

72. The search of Mr. Fields' phone was made without a warrant and without probable cause and constituted a violation of Mr. Fields' right to be free from unreasonable searches and seizures.

73. Defendant City of Philadelphia is responsible for the violations of Plaintiff's constitutional rights because the individual Defendants' actions resulted from the City's deliberate indifference to a custom, pattern, practice, or policy of allowing officers to retaliate against individuals for their expressive conduct in videotaping police undertaking their official duties, by, among other things, unlawfully confiscating and examining citizens' cellphones or other recording devices and/or a deliberately indifferent failure to train, supervise, and discipline officers who engage in such conduct.

## Count III – False Arrest and False Imprisonment
### (Against Defendant Sisca and the City of Philadelphia)

74. Plaintiff has a clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable seizure of his person, a right that Defendant

18

Sisca violated by handcuffing Plaintiff and arresting him without probable cause or reasonable belief that Plaintiff was committing a crime.

75. Defendant City of Philadelphia is responsible for the violation of Plaintiff's constitutional rights because Defendant Sisca's actions resulted from the City's deliberate indifference to a custom, pattern, practice, or policy of allowing officers to retaliate against individuals for their expressive conduct in recording police undertaking their official duties and/or a deliberately indifferent failure to train, supervise, and discipline officers who engage in such conduct.

### Count IV – Malicious Prosecution
### (Against Defendant Sisca and the City of Philadelphia)

76. Plaintiff has a clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable seizure of his person. Defendant Sisca violated this right when he initiated a criminal proceeding against Plaintiff in retaliation for Plaintiff's constitutionally protected photography of Defendant Sisca's public activities as a law enforcement officer with the PPD and in the absence of any probable cause to believe that Plaintiff had committed a crime.

77. The charges against Plaintiff were later terminated in his favor.

78. Defendant Sisca pursued this prosecution of Plaintiff with malice in retaliation for Plaintiff engaging in constitutionally protected activity, and without any probable cause or reasonable basis for believing that Plaintiff violated Pennsylvania's obstruction of highway statute, or that he committed any other crime.

79. Defendant City of Philadelphia is responsible for the violation of Plaintiff's constitutional rights because Defendant Sisca's actions resulted from the City's deliberate indifference to a custom, pattern, practice, or policy of allowing officers to arrest and charge individuals in retaliation for their expressive conduct in monitoring police undertaking their official duties in

19

public places and/or a deliberately indifferent failure to train, supervise, and discipline officers who engage in such conduct.

## PRAYER FOR RELIEF

Wherefore, in light of the foregoing, Plaintiff respectfully requests the following:

a. Enter a declaratory judgment that the Defendants violated Plaintiff's First Amendment right to observe police activity;

b. Enter a declaratory judgment that the Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure and malicious prosecution;

c. Award compensatory damages against all Defendants, joint and severally, in an amount to be determined at trial;

d. Award punitive damages against Defendant Sisca and John Doe;

e. Enter an award for costs, expenses, and counsel fees pursuant to 42 U.S.C. § 1988; and

f. Enter such other relief as this honorable Court may deem just and deserving.

Plaintiff hereby demands a jury trial.

July 24, 2014

Respectfully submitted,

MOLLY TACK-HOOPER
PA ID No. 307828
MARY CATHERINE ROPER
PA ID No. 71107
ACLU of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
Tel: (215) 592-1513 ext. 113
Fax: (215) 592-1343
mtack-hooper@aclupa.org
mroper@aclupa.org

20

JONATHAN H. FEINBERG
PA ID No. 88227
Kairys, Rudovsky, Messing, & Feinberg
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Tel: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com

JOHN J. GROGAN
PA ID No. 72443
PETER LECKMAN
PA ID No. 312076
Langer & Grogan, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320-5662 Tel.
215.320.5703 Fax.
jgrogan@langergrogan.com
pleckman@langergrogan.com

SETH KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

*Counsel for Plaintiff*

21